# UNITED STATES DISTRICT COURT
# DISTRICT OF IDAHO

| | |
|---|---|
| WOODBRIDGE PACIFIC GROUP, LLC, | Case No.: 1:22-cv-00414-REP |
| Plaintiff/Counter-Defendant, | **MEMORANDUM DECISION AND ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| vs. | |
| RED BUTTE, LLC, | |
| Defendant/Counter-Claimant. | |

Pending before the Court are the parties' cross motions for summary judgment.  Dkts. 34 and 36.  All parties have consented to the exercise of jurisdiction by a United States Magistrate Judge.  Dkt. 20.  For the reasons set forth below, the Court finds that the plain language of the parties' contract entitles Plaintiff to the return of its option deposit and that the evidence presented does not support waiver or amendment of this contractual right.  The Court, accordingly, will grant Plaintiff's motion for summary judgment and deny Defendant's motion for summary judgment.

## BACKGROUND

This case centers on a dispute over earnest money.  In February 2021, Plaintiff/Counter-Defendant Woodbridge Pacific Group, LLC ("WPG") entered a "Lot Option Agreement" ("LOA") with Defendant/Counter-Claimant Red Butte, LLC ("Red Butte") to purchase partially developed land for $15,500,000.  *See* Stip. SOF ¶¶ 1, 17, 29 (Dkt. 35-2).  The agreement concerned three subdivisions – SF15, SF16, and SF17 – collectively known as the "Legacy 73" lots.  *Id.* ¶¶ 1, 18.  The LOA required WPG to put down a deposit of $1,550,000, which it did. *Id.* ¶¶ 24, 35.  The LOA contained a condition that, if Red Butte did not record and provide

**MEMORANDUM DECISION AND ORDER - 1**

notice of the final plats for the SF15 and SF16 lots by June 1, 2022, WPG could terminate the deal and have its deposit returned. *Id.* ¶¶ 26-28.

It is undisputed that Red Butte did not provide notice of the final plats to WPG, until June 3, 2022, two days after the deadline. *Id.* ¶¶ 53, 55. On June 21, 2022, WPG informed Red Butte that it was electing to terminate the LOA and demanded the return of its deposit. *Id.* ¶¶ 76-77. Red Butte, however, refused to authorize the release of the $1,550,000. *Id.* ¶ 78. This lawsuit followed. The relevant facts are undisputed.

### A. The Lot Option Agreement

The parties executed the LOA on February 4, 2021. *Id.* ¶¶ 19-22. For the purposes of this lawsuit, the most critical portions of the LOA can be found in three sections labeled as "conditions precedent." These sections set deadlines for Red Butte to record and provide notice of the final plats ("Recordation Notice") and provide remedies for failing to meet these deadlines. *See* Stip. SOF ¶¶ 25-28 (Dkt. 35-2). For example, the parties agreed that the deadline for Red Butte to provide Recordation Notice for the SF15 and SF16 lots would be June 1, 2022. *Id.* The parties also agreed that WPG could terminate its option to purchase *all* the lots and have its deposit returned, if Red Butte did not meet the June 1, 2022 Recordation Notice Deadline. *Id.*

### B. Red Butte's Failure to Meet the Recordation Notice Deadline

Sometime in the spring of 2022, Red Butte informed WPG that Red Butte was unlikely to meet the June 1, 2022 Recordation Notice Deadline for the SF15 and SF16 lots. *Id.* ¶ 37. On May 23, 2022, Todd Cunningham, one of WPG's owners, sent an email to Marty Goldsmith, one of Red Butte's owners, about the deadline. *Id.* ¶¶ 4, 12, 39. The email stated:

> Apparently the June 1, 2022 "Recordation Notice Deadline" date for SF15 and SF16 is not going to be met by Red Butte. Accordingly we would like to amend the Lot Option Agreement to extend the "Recordation Notice Deadline" to a date that you all have some certainty such that we do not need to extend again.

*Id.* ¶ 39.  Cunningham offered to have WPG's attorney "draw up an amendment to the Lot Option Agreement to change the 'Recordation Notice Deadline' dates," or use Red Butte's attorney to do the same.  *Id.*

On May 25, 2022, Brian McColl, Red Butte's manager and legal counsel, responded to Cunningham's email.  *Id.* ¶¶ 5-7, 41.  McColl confirmed that "the Recordation Notice Deadlines for SF15 and SF16 will not be met."  *Id.* ¶ 41.  McColl attached an unsigned draft First Amendment to the LOA, which proposed extending the Recordation Notice Deadline to August 1, 2022.  *Id.* ¶¶ 41-42.  McColl concluded the email saying: "Let me know if the attached amendment works for you and I will sign it on behalf of Red Butte, LLC."  *Id.* ¶ 41.

Cunningham forwarded the proposed amendment to Carl Neuss, the co-owner of WPG.  *Id.* ¶¶ 12, 43.  Neuss responded with chagrin, observing that the amendment had no value for WPG.  *Id.* ¶ 44.  Neuss directed Cunningham (i) to drop the amendment and (ii) ask if Red Butte would be willing to restructure the deal on terms that were more favorable to WPG.  *Id.*

In accordance with Neuss's instructions, Cunningham emailed Goldsmith on May 26, 2022, stating:

> The 60 day delay of the Recordation Notice Deadline for SF15 and SF16 (from June 1, 2022 to August 1, 2022) may work for us.  However, given all the negative economic and housing market headlines in the press over the past several weeks along with exploding construction costs, our capital partners on SF15, SF16 and SF17 have become more cautious.  Accordingly, WPG has been asked about the possibility of splitting the project purchase structure into 2 pieces . . . . We have told our capital partners we would talk to you about this option.  Please give this some thought.  We would like to get on a call with you to discuss. Please let us know when we might be able to have such a call.

*Id.* ¶ 45.  Goldsmith responded: "[N]o reason for a call.  We will not be granting any re structuring [sic] of the closing dates.  Without looking I believe you could request your earnest money back now, otherwise, we will continue forward and get these plats recorded and expect you to close within 15 days of the recordation notice."  *Id.* ¶ 46.

**MEMORANDUM DECISION AND ORDER - 3**

On May 31, 2022, the day prior to the Recordation Notice Deadline, Cunningham replied to Goldsmith as follows:

Understand your email below.

The constant stream of negative headlines for the US housing market and economy are creating caution among investors.  However the special positives which characterize the Boise region can help us overcome these headwinds.  To counter current headlines, WPG is preparing a full market update which will be shared with our investors in an upcoming presentation.  We expect this update to overcome any concerns about Boise market conditions.  The slight delay in the "Recordation Notice" date for the 73 Legacy lots will give us the time to do this.

We'd like to report the revised timeframe for the close of escrow on the 73 lots.  Please let us know your best estimate for the "Recordation Notice" dates for SF15, SF16 and SF17 so we can provide the new target closing date to our capital partners.

*Id.* ¶ 48.  Goldsmith responded the same day that "all three plats [were] at the County, the last primary agency needed to sign."  *Id.* ¶ 49.  Goldsmith explained that the County's approval could "go very fast" or take a couple of weeks.  *Id.*

The June 1, 2022 Recordation Notice Deadline expired without further action.  Red Butte did not provide WPG with the required notice.  *Id.* ¶ 53.  Nor did either party sign the proposed amendment extending the Recordation Notice Deadline.  *Id.* ¶ 50.

C.  WPG's Decision to Terminate

On June 3, 2022, two days after the Recordation Notice Deadline for SF15 and SF16, Red Butte provided WPG with Recordation Notice for all 73 lots.  *Id.* ¶ 55.  This act triggered a 15-day deadline, under the LOA, for the parties to close the purchase.  *Id.* ¶¶ 30-32.  Relevant here, the LOA provided that if the closing deadline fell on a weekend or holiday, the deadline would be extended to the next business day.  *See* LOA § 25 (Dkt. 34-10, pp 3-18).

In the email providing Recordation Notice, Goldsmith reminded WPG of the closing deadline, but misstated the deadline as May 20, 2022.  *See* Stip. SOF ¶ 56 (Dkt. 35-2).  Four days

**MEMORANDUM DECISION AND ORDER - 4**

later, on June 7, 2022, Goldsmith emailed the title company saying that WPG and Red Butte had agreed to a closing date of June 20, 2022. *Id.* ¶¶ 58. The title company pointed out that Monday June 20th was a holiday and proposed moving the closing to Friday June 17th or Tuesday June 21st. *Id.* WPG's Vice President of Operations, Jim Perry, who was copied on the email exchange, requested June 21, 2022. *Id.* Perry explained that WPG was "geared up to close on 6/20 so . . . [needed] a 6/21 close." Email Exh. 31 (Dkt. 34-10, pp 115-117). Goldsmith agreed that June 21, 2022 worked for Red Butte. *Id.*

The very next day, June 8, 2022, Cunningham sent Goldsmith an email with five attachments, which discussed changes to the Boise housing market. *See* Stip. SOF ¶ 59 (Dkt. 35-2). Cunningham informed Goldsmith that "[t]his kind of news is wearing on our private investor group and we are having another conference call tomorrow to address the concerns." *Id.* Cunningham warned Goldsmith that: "Things are definitely changing" and promised to let Goldsmith "know the outcome of tomorrow's call." *Id.*

Goldsmith immediately responded: "[T]he Boise market is going to be hard to beat in the long run. I can sell the lots to another builder if and when you want out, please let me know." *Id.* ¶ 60. Goldsmith blind copied Red Butte's broker, Jimmy Roumanis, on this response. *Id.* ¶ 66, Email Exhs. 79-80 (Dkt. 34-10, pp 236-240). In a private email exchange, Goldsmith and Roumanis discussed the possibility that WPG would withdraw from the sale. Goldsmith told Roumanis that WPG could get its "earnest money back on about 51 of the 72 lots" because Red Butte recorded the SF15 and SF16 plats "two days past the recording date deadline." Email Exh. 79 (Dkt. 34-10, pp 236-237).

On Friday, June 10, 2022, Cunningham emailed Goldsmith with WPG's "final decision" regarding the purchase of the Legacy 73 lots. *See* Stip. SOF ¶ 63 (Dkt. 35-2). The email informed Red Butte that WPG would not purchase any of the lots unless Red Butte agreed to

**MEMORANDUM DECISION AND ORDER - 5**

four new purchase conditions, one of which significantly reduced number of lots that WPG was

obligated to buy.  *Id.* ¶ 64.  The email stated that if Red Butte agreed, WPG would need a "slight

closing date extension."  *Id.*  The email offer ended: "WPG understands if you elect not to

proceed with the terms outlined above and we mutually agree to cancel the current escrow, return

the deposit to WPG and you proceed to seek another buyer."  *Id.*

That night, Roumanis emailed another builder named Lennar on Red Butte's behalf.  *Id.* ¶

66 and Email Exh. 80 (Dkt. 34-10, pp 238-240).  Roumanis offered to have Red Butte sell the

Legacy 73 lots to Lennar in the event WPG elected not to close on the sale.  *Id.*

On the next business day, Monday, June 13, 2022, Goldsmith responded to WPG's

demand both by phone and by email.  First, Goldsmith emailed Cunningham saying he could ask

McColl to "get" WPG "a time extension to close Phase 15 on this coming June 28th."  *See* Stip.

SOF ¶ 67 (Dkt. 35-2).  Second, Goldsmith called Cunningham and agreed to WPG's proposal to

reduce the number of lots involved in the transaction.[1]  *Id.* ¶ 68.

After the phone call, Cunningham sent Goldsmith an email indicating that a June 28,

2022 closing "should" work for WPG.  *Id.* ¶ 69.  Cunningham stressed, however, that "all

deposits in escrow ($1,550,000)" would need to be "applied to the SF15 closing."  *Id.*  He

underscored the importance of this condition, stating: "I want it to be crystal clear for escrow by

including this in the amendment to extend the close date.  If you do not agree then we need to

talk about it ASAP."  *Id.*

A few minutes later, Goldsmith sent Cunningham a one-line email, which read: "Todd,

attached find the amendment.  Let me know you got it."  Email Exh. 46 (Dkt. 34-10, pp 126-

---

[1] Cunningham does not remember this call.  WPG has agreed, however, that the Court should
treat the phone call as fact for the purposes of ruling on the parties' motions for summary
judgment.  *See* Stip. SOF at 19, n. 6 (Dkt. 35-2).

**MEMORANDUM DECISION AND ORDER - 6**

127).  The email had an unsigned amendment to the LOA as an attachment.  *See* Stip. SOF ¶ 70

(Dkt. 35-2).  The unsigned amendment incorporated the changes WPG had demanded over email

three days prior, on June 10, 2022.  *Id.* ¶¶ 64, 71.  Like the proposed amendment extending the

Recordation Notice Deadline, however, the second proposed amendment was never signed or

executed.  *Id.* ¶¶ 72.  After meeting with its investors, WPG decided not to proceed with the sale

in any form.  *Id.* ¶¶ 73-76.

On June 21, 2022, WPG sent Red Butte and the Escrow Holder a Termination Notice.  *Id.*

¶ 77.  WPG requested that the Escrow Holder immediately release the deposit to WPG pursuant

to the terms of the LOA.  *Id.*  Red Butte sent a letter to WPG and the Escrow Holder, through

legal counsel, demanding that WPG proceed with the sale of the SF15 lots according to the terms

set forth in Cunningham's June 10, 2022 email.  *Id.* ¶ 78.  Red Butte refused to approve the

release of the deposit to WPG.  *Id.* ¶¶ 78-80.

D. The Lawsuit

In the complaint and counterclaim, both parties demand receipt of the option deposit.

WPG's theory of relief is relatively straightforward: because Red Butte missed the Recordation

Notice Deadline, WPG contends it was entitled to terminate the sale and receive its earnest

money back.  Red Butte, by contrast, takes the proverbial shotgun approach in its defense.  First,

Red Butte claims that its failure to timely provide Recordation Notice cannot form the basis of a

breach of contract claim because the parties jointly ignored the June 1, 2022 Recordation Notice

Deadline.  Second, Red Butte insists that WPG waived its right to enforce the Recordation

Notice Deadline.  Third, Red Butte maintains that WPG elected to proceed with the sale after

Red Butte missed the Recordation Notice Deadline.  Fourth, Red Butte contends that a two-day

delay in providing notice is not a material breach of contract.  Fifth, and finally, Red Butte

**MEMORANDUM DECISION AND ORDER - 7**

asserts that it accepted WPG's June 10, 2022 email offer to amend the LOA and that WPG's breach of that amended agreement entitled Red Butte to the option deposit.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When applying these standards, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) and *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001). "[T]he weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Summary judgment, accordingly, requires that no reasonable trier of fact could find other than for the moving party. *Id.* at 252.

The Court evaluates cross motions for summary judgment individually, each on its own merits. *Fair Housing Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

## ELEMENTS OF A BREACH OF CONTRACT CLAIM

In Idaho, a breach of contract claim has four elements: (i) the existence of a valid contract, (ii) breach of the terms of that contract, (iii) causation of damages, and (iv) the extent of those damages. *Safaris Unltd., LLC v. Von Jones*, 353 P.3d 1080, 1084 (Idaho 2015).

## DISCUSSION

A. Under the plain language of the LOA, Red Butte's failure to provide timely Recordation Notice entitled WPG to cancel the agreement any time before closing and receive its earnest money back.

"When interpreting a contract, [the] [c]ourt begins with the document's language." *River Range, LLC v. Citadel Storage, LLC*, 166 Idaho 592, 599 (Idaho 2020) (internal quotation

**MEMORANDUM DECISION AND ORDER - 8**

omitted).  If this language is unambiguous, the Court will "construe" the meaning of the contract as a matter of law, reading the contract "in its plain, ordinary and proper sense."  *Id.*

In this case, the relevant portions of the LOA are unambiguous.  To begin, it is undisputed that the LOA permits WPG to terminate the contract and have its deposit returned if Red Butte does not provide Recordation Notice for the SF15 and SF16 lots by June 1, 2022.  *See* LOA §§ 4-6 (Dkt. 34-10, pp 3-18).  Contrary to Red Butte's suggestion, the LOA does not require WPG to exercise this right immediately.

Several sections of the LOA make it clear that, once it is triggered, WPG's right to terminate the LOA extends until the closing date or until WPG waives the right to terminate.  For instance, Section 1 of the LOA conditions WPG's duty to purchase the finished lots on certain requirements[2] being "satisfied or waived," including the Recordation Notice Deadline for SF15. *Id.* ¶¶ 1, 4.  Section 8.1 goes further, identifying both the "timely" provision of Recordation Notice and WPG's decision not to terminate the agreement as "closing conditions" for the SF15 lots.  *Id.* ¶ 8.1 ("Provided Buyer has not previously terminated this Agreement, and provided further that Developer has timely provided Buyer with a Recordation Notice for SF15, the parties shall proceed to close the purchase and sale . . . .").  Finally, Section 21, which is titled "Buyer Conditions to Closing" reserves the right for WPG to "elect not to close escrow" and receive an "immediate refund of any deposits" if *any* of the closing conditions are not "satisfied or waived."

---

[2] The LOA refers to these requirements as "conditions precedent."  *See* LOA §§ 2, 4 (Dkt. 34-10, pp 3-18).  Red Butte devotes a significant portion of its opening brief to attacking this designation.  Red Butte contends that conditions precedent are disfavored and that the Recordation Notice deadline is better understood as a promise to perform.  D's MSJ at 14-19 (Dkt. 36-1).  Red Butte *may* be correct.  The Court, however, need not resolve this issue. Treating the Recordation Notice deadline as a promise to perform does not change the outcome of this case.  However the Recordation Notice deadline is categorized, Red Butte's failure to meet that deadline provided WPG the right to terminate the sale and receive its deposit back under the plain language of the LOA.  *See* LOA §§ 4-6 (Dkt. 34-10, pp 3-18).

**MEMORANDUM DECISION AND ORDER - 9**

Section 21 defines "closing conditions" broadly, in a manner that includes the Recordation Notice Deadline.[3]

WPG's right to terminate the LOA extended to closing (or until it was waived) under the plain language of these provisions. Absent a showing of waiver or a modification of the LOA, therefore, WPG is entitled to the return of the option deposit.

Idaho case law does not compel a contrary conclusion. Rather than focus on the language of the LOA, Red Butte argues that two Idaho cases – *Citadel* and *Steiner*[4] – bar WPG from asserting a breach of contract claim and that Red Butte is, therefore, entitled to keep the option deposit. Red Butte reads *Citadel* and *Steiner* far too expansively. In *Citadel* and *Steiner*, the seller-defendants each missed a deadline antecedent to closing on a property sale, as Red Butte did here.[5] The Idaho Supreme Court held that the buyers in these cases could not "claim breach by the passage of [the] deadline[s]" because they had ignored the deadlines and proceeded with the contracts. *Citadel*, 166 Idaho at 601 (discussing *Steiner*, 138 Idaho at 243). Unlike the LOA here, however, contracts in *Citadel* and *Steiner* did not specify a particular remedy for the seller's late performance. *Id.* This is a critical difference.

It is black letter law that the plain language of a contract controls unless the contract violates public policy or is otherwise illegal. *Fletcher v. Lone Mt. Rd. Ass'n*, 162 Idaho 347, 353 (Idaho 2002). There is nothing in *Citadel* to the contrary. As *Citadel* repeatedly highlights,

---

[3] Under Section 21, "closing conditions" include "all other conditions for the benefit of Buyer as set forth in this Agreement." *Id.* ¶ 21.5.

[4] *Citadel*, *supra*, and *Steiner v. Ziegler-Tamura, Co.*, 138 Idaho 238 (Idaho 2002).

[5] In *Steiner*, for example, the seller concluded its cleanup of the property about three months after the deadline for removing the debris. *Steiner*, 138 Idaho at 240. In *Citadel*, on the other hand, the seller provided the preliminary title commitment to the buyer 18 days late. *Citadel*, 166 Idaho at 596.

**MEMORANDUM DECISION AND ORDER - 10**

resolving a dispute over earnest money starts with the language of the contract.  *Citadel*, 166

Idaho at 599-600 (analyzing the plain language of the contract to determine if earnest money was

refundable).  If the contractual language is unambiguous, it controls.  *Id.* at 599 (the court must

"give full force and effect to the words of the contract . . .").  If the language it not clear – for

example, if the contract does not specify what happens in the event of late performance – the

court may use other tools to resolve the dispute.  But that does not mean the Court may elevate

judge-made rules, such as Idaho's "ignore-the-deadline" rule, over the parties' contractual

agreements.  *See Fletcher*, 162 Idaho at 353 (the "freedom to contract allows [parties] to

reallocate duties that would otherwise be imposed by law, provided that such a reallocation of

duties is not illegal or [does not] violate public policy").

Once Red Butte missed the Recordation Notice Deadline, the LOA gave WPG until

closing (or until waiver, if that should occur before the closing date) to terminate the contract and

receive its deposit back.  The law requires the Court to honor that agreement.

B.  Red Butte's waiver defense fails as a matter of law because Red Butte has not presented evidence of detrimental reliance.

Under Idaho law, waiver of a contractual right has two components: (1) the "voluntary,

intentional" relinquishment of a known right or advantage and (2) detrimental reliance.  *Bronco*

*Elite Arts & Ath., LLC v. 106 Garden City, LLC*, 534 P.3d 558, 570 (Idaho 2023).  The existence

of waiver is normally a question of fact.  *Id.* at 571.  If "any substantial evidence in the record"

supports a waiver, "it is for the trier of fact to determine whether the evidence establishes . . . a

waiver."  *Id.* (cleaned up).  The Court can only resolve a dispute over waiver if the facts are not

in dispute and "only one reasonable inference can be drawn from them."  *Id.*

While the facts of this case are undisputed, reasonable jurors could draw differing

inferences about whether WPG voluntarily and intentionally relinquished the right to enforce the

**MEMORANDUM DECISION AND ORDER - 11**

Recordation Notice Deadline.  The Court will not grant either party summary judgment on this question.  *See Fresno Motors, LLC v. Mercedes Benz USA*, *LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) ("Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts.") (internal citation omitted).

That said, the Court agrees with WPG that Red Butte's waiver defense fails as a matter of law on the second element of the defense.  As the party asserting waiver, Red Butte must "show that [it] acted in reasonable reliance upon [the waiver] and that [it] thereby . . . altered [its] position to [its] detriment."  *Pocatello Hosp., LLC v. Quail Ridge Med. Investor, LLC*, 156 Idaho 709, 719 (Idaho 2014).  Notably, Red Butte does not claim that it missed the Recordation Notice Deadline because it was lured into complacency by Cunningham's proposal to extend the deadline.[6]  Red Butte's three reliance arguments are more tenuous.

First, Red Butte claims it relied on Perry's statement that WPG was "geared up" to close when it recorded the final plats.  D's MSJ at 26 (Dkt. 36-1).  This argument turns the timeline upside-down.  Perry – WPG's Vice President of Operations – did not tell Red Butte that WPG was "geared up to close" until June 7, 2022, four days after Red Butte had already provided Recordation Notice on June 3, 2022.  *See* Stip. SOF ¶¶ 55, 58 (Dkt. 35-2) and Email Exh. 31 (Dkt. 34-10, pp 115-117).  It is chronologically impossible, therefore, that Perry's statements are the reason Red Butte proceeded to record the final plats.  Even if this was not the case, Red Butte makes no attempt to show that recording the plats was detrimental to its business.

Second, Red Butte maintains that it relied on Perry's statements when it "kowtowed" to WPG's last minute demand to restructure the deal.  D's MSJ at 26 (Dkt. 36-1).  As the Court understands it, Red Butte is saying it relied on WPG honoring the original LOA when it yielded

---

[6] It appears undisputed that Red Butte was not going to meet the Recordation Notice Deadline whether WPG offered an extension that it later withdrew, or not.  *See* Stip. SOF ¶ 41 (Dkt. 35-2).

**MEMORANDUM DECISION AND ORDER - 12**

to WPG's subsequent "demand" to amend the LOA.  This is nonsensical.  When it agreed to amend the LOA, Red Butte knew that WPG was threatening to back out of the deal and was attempting to negotiate new terms.  *See* Stip. SOF ¶¶ 60-61, 63-66 (Dkt. 35-2).  Red Butte cannot credibly claim reliance under these circumstances.  Nor can it show detriment; there is no evidence that Red Butte's decision to agree to an amendment that was abandoned less than two weeks later put Red Butte in a worse position than it would have been in had Red Butte refused the amendment.

Finally, at the summary judgment hearing, Red Butte argued that it lost the opportunity to offer the lots to other buyers during the period when it thought WPG was planning to proceed to closing.  The problem with this argument is that it was not WPG's alleged waiver that "tied up" the property, but the LOA.  As outlined above, once Red Butte missed the Recordation Notice Deadline, WPG had until closing to decide whether to terminate the LOA or instead to waive timely provision of Recordation Notice and proceed with the sale.  *See supra* pp. 8-10.  Red Butte was not at liberty to sell the property to someone else while it was waiting for WPG to make this decision, waiver or no waiver.  In these circumstances, surprise at WPG's last minute decision to terminate is not enough to show detrimental reliance.  *See Willig v. Department of Health & Welfare*, 127 Idaho 259, 261 (Idaho 1995).

The facts of *Willig* are illustrative.  In *Willig*, the plaintiff argued that the doctrine of equitable estoppel prevented the Department of Health and Welfare from collecting an overpayment of welfare benefits.  The Supreme Court explained that the obligation to repay the misallocated funds was not enough to show that the plaintiff suffered a detriment.  The Court likened it to a previous case – *Brand S Corp. v. King*, 102 Idaho 731 (1981) – in which the Idaho Supreme Court "refused to estop a creditor from collecting an unpaid loan, even though the creditor had allegedly told the debtor it would forgo collection."  *Willig*, 127 at 261.  In both

cases, the Idaho Supreme Court concluded that mere repayment – i.e., holding the plaintiff to its original bargain – did not constitute detrimental reliance. *Id.* For the creditor to be estopped from enforcing the debt, the plaintiff was required to show "additional circumstances" indicating that the plaintiff "changed . . . position as a result of the alleged representation and suffered a detriment as a result thereof." *Id.*

The same reasoning applies here. To establish detrimental reliance, it is not enough for Red Butte to show that it was harmed by WPG's exercise of its contractual rights. It must show that it changed position to its detriment in reliance on WPG's alleged waiver. *Willig*, 127 at 261; *Quail Ridge*, 156 Idaho at 719. Red Butte, however, has not presented any evidence that it modified its behavior based on Cunningham's or Perry's statements. For example, there is no evidence that Red Butte began scouting for alternative buyers when it realized it was not going to meet the Recordation Notice Deadline, but then stopped its search based on something WPG said. Nor is there evidence that Red Butte affirmatively rejected alternative buyers in the mistaken belief that WPG was "geared up" to close. The evidence that is available repudiates such claims of reliance.

First and foremost, Red Butte told WPG that it could back out of the deal on two separate occasions. *See* Stip. SOF ¶¶ 46, 60 (Dkt. 35-2). The circumstances surrounding the second of these emails is particularly telling. On June 8, 2022, only one day after Perry's email saying WPG was "geared up" to close, Cunningham alerted Goldsmith that "things" were "changing." *See* Stip. SOF ¶¶ 58-60 (Dkt. 35-2). While this warning was oblique, there is no question that it hit its mark. Goldsmith (i) immediately responded that Red Butte could "sell the lots to another builder" if WPG wanted out, (ii) alerted Red Butte's broker to the possibility that WPG would withdraw from the sale, and (iii) privately acknowledged that WPG could get some of its deposit

back.[7]  *Id.* ¶ 61; Email Exh. 79 (Dkt. 34-10, pp 236-237).  This evidence shows that any

misimpression caused by Perry's comment was quickly dispelled.  By June 8, 2022, Red Butte

was aware that WPG was considering withdrawing from the sale and was privately discussing

the consequences of such a decision.

Second, Red Butte did not wait idly for the closing date; on June 10, 2022, Red Butte's

broker sent another builder an offer to sell the Legacy 73 lots in the event WPG elected not to

close on the sale.  *See* Stip. SOF ¶ 66 (Dkt. 35-2).  Faced with this evidence, no reasonable juror

could find in Red Butte's favor on its claim of detrimental reliance.[8]  Its waiver defense,

consequently, fails as a matter of Idaho law.

In an attempt to avoid this outcome, Red Butte contends that the LOA creates a

contractual waiver defense, separate and apart from Idaho's equitable waiver defense, and that

this contractual waiver defense does not require a showing of detrimental reliance.  The Court is

unpersuaded.

As Red Butte acknowledges, the LOA never defines the term "waiver."  In these

circumstances, it is the practice of the Idaho Supreme Court to interpret the word according to its

normal legal meaning.  *Bronco*, 534 P.3d at 572-573.  In *Bronco*, for instance, a landlord entered

a long-term rental agreement that gave the tenant the right to purchase the property after five

years as long as the tenant was not in "breach" of the lease.  *Id.* at 564-565.  The parties

disagreed about whether the term "breach," as used in this provision, meant any "breach" or only

---

[7] Red Butte is correct that Goldsmith is not an attorney, and his legal interpretations are not
binding on this Court.  D's MSJ at 25 (Dkt. 36-1).  These emails, however, remain relevant to
Goldsmith's state of mind.  Red Butte argues that it relied on Perry's statement that WPG was
going to close.  Goldsmith's emails rebut this claim.

[8] It would be complete speculation for a jury to conclude that Red Butte turned down any
unnamed, substitute buyers before June 10, 2022.

**MEMORANDUM DECISION AND ORDER - 15**

a "material breach." *Id.* at 572.  Pointing to "plain legal meaning," the Idaho Supreme Court

found that the term "breach" as used in the contract meant a material breach, even though the

contract did not use the word "material." *Id.* at 572-573.

The reasoning of *Bronco* applies with equal force here.  Because the LOA provides no

guidance about when a condition should be deemed "waived," the assumption is that the parties

were using the term according to its normal legal usage.  In Idaho, under whose law the parties

contracted,[9] waiver includes an element of detrimental reliance. *Id.* at 570.  Again, Red Butte

has not established that element, and accordingly, its waiver defense fails as a matter of law.

> C. Red Butte's "election to proceed" argument does not provide an independent
> basis for relief.

In its motion for summary judgment, Red Butte asserts several arguments that sound in

waiver, but are not grounded in Idaho waiver law.  Most notably, Red Butte argues that WPG

was barred from terminating the LOA because it "elected to proceed" with the contract after Red

Butte missed the Recordation Notice Deadline.  D's MSJ at 19-21 (Dkt. 36-1).  Red Butte does

not cite any Idaho law to support this argument. *Id.*

It is not clear that this argument adds anything to Red Butte's case that has not already

been covered by Red Butte's previous arguments.  To the extent Red Butte's "election-to-

proceed" argument is a waiver argument in disguise, Idaho waiver law controls.  To the extent

Red Butte is asking the Court to shorten the time for WPG to exercise its right to terminate, Red

Butte's "election-to-proceed" argument fails for the same reason Red Butte's attempt to

analogize this case to *Citadel* and *Steiner* fail.  The LOA specifies the procedure to be followed

---

[9] Section 29 of the LOA provides that the LOA "shall be governed by the laws of the State of
Idaho."  LOA § 29 (Dkt. 34-10, pp 3-18).

in the case of an untimely disclosure of the final plats and the Court is bound to follow that

procedure. *Citadel*, 166 Idaho at 599.

      D. <u>Refusing to release a $1.55 million deposit is a material breach.</u>

    Red Butte's next argument is that "WPG's claim for breach of contract is categorically

barred from the start. . . because Red Butte's delay of less than 48 hours in meeting the

Recordation Notice Deadline is not a 'material' breach of the LOA."  D's MSJ at 27 (Dkt. 36-1).

This argument strikes the Court as purposefully obtuse.

    As WPG repeatedly stresses, the breach on which WPG seeks summary judgment is Red

Butte's refusal to release the deposit, not its untimely provision of Recordation Notice.  Pl.'s Rsp

6 (Dkt. 39).[10]  Refusing to return a $1.55 million deposit is clearly material.  *See Hull v. Giesler*,

156 Idaho 765, 774 (Idaho 2014) (a breach of contract is material when it "touches the

fundamental purpose of the contract and defeats the object of the parties in entering into the

contract").

    Even if Red Butte could convince a jury that keeping a $1.55 million deposit that belongs

to WPG was not "material," that would not justify the relief Red Butte seeks.  The purpose of

distinguishing between material and immaterial breaches is to determine the appropriate remedy

for a breach.  "If a breach of contract is material, the other party's performance is excused."  *Rice

v. Sallaz*, 159 Idaho 148, 154 (Idaho 2015).  If a breach is immaterial, on the other hand, "the

existing rights of the parties do not change.  The contract remains enforceable although the

---

[10] Contrary to Red Butte's oral argument, this is not a new claim.  WPG's complaint asserts a
breach of contract claim based on Red Butte's refusal to accept the Termination Notice and
release the option deposit.  Compl. ¶¶ 43-44 (Dkt. 1).

**MEMORANDUM DECISION AND ORDER - 17**

breach may occasion liability for damages, if any can be proved." *Aldape v. Lubcke*, 107 Idaho 316, 317-318 (Idaho 1984).[11]

Here, WPG is not asking the Court to excuse it from its obligations under the LOA as a judicial remedy for Red Butte's two-day delay in providing Recordation Notice. WPG is demanding the return of the option deposit under the plain language of the LOA. In other words, WPG is seeking to enforce the LOA, not be relieved from it. Materiality is not an element of this claim. *See* Idaho Pattern Jury Instruction 6.10.1 (listing the elements of a breach of contract claim). To obtain relief, all WPG needs to show is that the LOA entitled it to the return of the option deposit and that Red Butte refused to honor that agreement. *See Aldape*, 107 Idaho at 317-318 (non-material breaches can give rise to damages).

Holding otherwise would read WPG's right to terminate out of the LOA, at least in cases where the delay in providing the Recordation Notice was minimal. While this may be more equitable, courts lack "the roving power to rewrite contracts" to make them fairer. *Shawver v. Huckleberry Estates, L.L.C.*, 140 Idaho 354, 362 (Idaho 2004). Red Butte's complaints about WPG terminating a $15.5 million deal that was pending for 18 months based on a 48-hour delay are misdirected. Red Butte signed a contract permitting WPG to take these steps. Red Butte and the Court are bound by the bargain Red Butte struck.

E.   The parties did not enter an enforceable amendment of the LOA.

Red Butte's final argument is that the parties amended the LOA when WPG requested new purchase terms over email and Red Butte orally agreed to those terms. D's MSJ at 30 (Dkt.

---

[11] Given this framework, material breaches are almost always asserted as an affirmative defense, not a stand-alone claim. *See Melaleuca, Inc. v. Foeller*, 155 Idaho 920, 924 (Idaho 2017) (explaining that a defendant can avoid liability on a breach of contract claim by raising the plaintiff's material breach as an excuse); *see also Taylor v. Taylor*, 169 Idaho 806, 817 (Idaho 2022) (identifying the other party's material breach as an "affirmative defense" to a breach of contract claim).

**MEMORANDUM DECISION AND ORDER - 18**

36-1).  The Court is sympathetic to the contention that parties should generally honor their offers and agreements.  The Court's hands, however, are tied.  The parties' agreement is not legally enforceable because (i) it does not comply with the statute of frauds and (ii) it violates the modification requirements of the LOA.

      *1.   The Statute of Frauds*

      The statute of frauds requires written documentation for certain agreements, including the transfer of real property, to be valid.  *David & Marvel Benton v. McCarty*, 161 Idaho 145, 152-153 (Idaho 2016).  The Idaho statute of frauds for real property states that:

> No estate or interest in real property, other than for leases for a term not exceeding one (1) year, nor any trust or power over or concerning it, or in any manner relating thereto, can be created, granted, assigned, surrendered, or declared, otherwise than by operation of law, or a conveyance or other instrument in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same, or by his lawful agent thereunto authorized by writing.

I.C. § 9-503.  As an initial matter, the Court agrees with Red Butte that WPG's emails count as signed writings for the purposes of this statute.

      In *SRM Arms, Inc. v. GSA Direct, LLC*, 169 Idaho 196 (Idaho 2021), the Idaho Supreme Court treated an email as a writing that satisfied the statute of frauds for the purposes of § 9-505, Idaho's non-real-property statute of frauds.  *Id.* at 210.  While the wording of § 9-503 and § 9-505 slightly differ, both sections state that the agreement must be "in writing" and "subscribed by" certain parties.  These terms should be given the same meaning across both statutes.  *See State v. Casselman*, 69 Idaho 237, 245 (Idaho 1949) ("Similar expressions in civil . . . statutes dealing with same general subject should be given uniform construction.").  This reading accords with the long-standing recognition that § 9-503's signature requirement can be satisfied by "any symbol made or adopted by a party, with an actual or apparent intent to authenticate the writing and give it force and effect," including a signature that is typed or

**MEMORANDUM DECISION AND ORDER - 19**

printed.  *George W. Watkins Family v. Messenger*, 115 Idaho 386, 389 (Idaho App. 1988).  The

Court sees no reason to treat typed email signatures differently.

The Uniform Electronic Transactions Act (the "UETA") bolsters this conclusion.  The

commentary to the UETA addresses the interaction between the UETA and the statute of frauds

as follows:

> While [the UETA] would validate an electronic record for purposes of a statute of
> frauds, if an agreement to conduct the transaction electronically cannot reasonably
> be found . . . then a necessary predicate to the applicability of this Act would be
> absent and this Act would not validate the electronic record.  Whether the
> electronic record might be valid under other law is not addressed by this Act.

Commentary to I.C. § 28-50-107 at ¶ 2.[12]  In this case, the UETA governs WPG and Red Butte's

dealings.  As WPG highlights, the UETA applies "to transactions between parties each of which

has agreed to conduct transactions by electronic means."  I.C. § 28-50-105(b).  WPG reads the

term "agreed" narrowly.  The commentary to the UETA, however, adopts the opposite approach.

Specifically, the comments to § 28-50-105(b) warn that "[b]road interpretation of the term

agreement is necessary to assure that [the UETA] has the widest possible application consistent

with its purpose of removing barriers to electronic commerce."  Commentary to I.C. § 28-50-

105.  Giving out a business card with an e-mail address, for example, may be sufficient to show

that a party agreed to conduct business electronically.  *Id.*

WPG did far more than give out a business card with an email address.  It repeatedly and

willingly engaged in contract negotiations over email, both when entering the original LOA and

---

[12] As this comment indicates, the UETA is not the exclusive means of validating electronic
signatures.  UETA does not displace the functioning of "other law."  *Id.*; *see also McClare v.
Rocha*, 2014 ME 4, 12 (Maine 2014) ("An email or other electronic record can constitute a
signed writing based on the historically broad interpretation of the term 'writing' in the statute of
frauds and, *separately*, based on the [UETA.]") (emphasis added).

**MEMORANDUM DECISION AND ORDER - 20**

when discussing potential amendments to the LOA.  *See* Stip. SOF ¶¶ 19-21, 39, 45, 48, 57-59, 63-64, 69 (Dkt. 35-2).  This is more than enough for the UETA to apply.

WPG's insistence that it did not intend to consummate a multi-million-dollar deal over email confuses the issues.  WPG has a legitimate argument that it did not intend to finalize the proposed amendment until a formal agreement was drafted and signed.  *See* Stip. SOF ¶¶ 69 (Dkt. 35-2) (contemplating a written amendment); *see also* Pl.'s MSJ at 19-21 (Dkt. 35-1).  But this is a different question than whether the UETA applies.  *See Seward v. Musick Auction, LLC*, 164 Idaho 149, 159 (2018) (discussing "mutual intent to contract" prior to "the drafting and execution of a contemplated formal writing") and *Sword v. Sweet*, 140 Idaho 242, 247 (Idaho 2004) (distinguishing between preliminary negotiations and finalized contracts).[13]  The "fundamental premise" of the UETA is that the "the medium in which a record, signature, or contract is created, presented or retained" should not undermine its "legal significance."  Comment 1 to I.C. § 28-50-107.  The UETA's applicability requirements must be understood within this framework.  If Cunningham had printed his June 10, 2022 email offer and mailed it to Red Butte, it would qualify as a signed writing under I.C. § 9-503.  *See Watkins*, 115 Idaho at 389.  Sending the offer over email does not insulate it, under the UETA, from the Court's consideration, especially when that was the normal mode of communications between the parties.

The problem for Red Butte is that even when the parties' emails are taken into account, the statute of frauds remains unsatisfied.  As outlined above, the statute of frauds requires an agreement transferring an interest in real property to be in writing "signed by the party granting the interest."  *Sec. Inv'r Fund LLC v. Crumb*, 165 Idaho 280, 286 (Idaho 2019).  It is undisputed

---

[13] Given the statute of frauds and Section 30 of the LOA, the Court does not reach the issue of mutual assent in its Memorandum Decision and Order.

**MEMORANDUM DECISION AND ORDER - 21**

that WPG extended a written, signed offer to amend the LOA.  But Red Butte's acceptance was conveyed orally.

Red Butte's written responses are confined to two short emails.  The first states: "I can ask Brian to get you a time extension to close Phase 15 on this coming June 28th."  *See* Stip. SOF ¶ 67 (Dkt. 35-2).  This email responds to WPG's request for an extension of the closing date; but it does not mention, let alone accept, any of WPG's other proposed changes.

The second email contains an *unsigned* amendment as an attachment and a one sentence note reading: "Todd, attached find the amendment.  Let me know you got it."  Email Exh. 46 (Dkt. 34-10, pp 126-127).  This email corroborates Red Butte's claim that it orally accepted WPG's offer.  The email stops short, however, of documenting Red Butte's acceptance in writing.

Consider, Red Butte could have sent the exact same email after a phone call in which Goldsmith (i) expressed interest in the offer, (ii) made it clear he needed to talk it over with his broker or explore other options before making a final decision, and (iii) offered sent a draft amendment to WPG to keep negotiations moving while Red Butte made a final decision.  The Court is not suggesting that this is what happened.  The statute of frauds, however, is meant to foreclose such questions regarding land deals.

A contract for the sale of land "must speak for itself."  "[P]arol evidence will not be admitted to supply any of its terms."  *Lexington Heights Dev., LLC v. Crandlemire*, 140 Idaho 276, 281 (Idaho 2004).  In its two written email responses, Red Butte never accepts WPG's offer to amend the LOA.  The emails do not, consequently, satisfy the statute of frauds.

### 2. *Section 30 of the LOA*

Section 30 of the LOA states: "This Agreement may be modified only by a written instrument signed by the Developer and the Buyer."  Red Butte does not contest WPG's claim

that the alleged amendment ran afoul of this provision.[14]  Instead, Red Butte argues WPG waived Section 30's written instrument requirement when Cunningham and Goldsmith spoke on the phone.  D's MSJ at 33 (Dkt. 36-1).  The evidence does not support this position.

First, the only information in the record about the phone call is that Goldsmith agreed to reduce the number of lots in the sale and apply the entire option deposit to the purchase price. *See* Stip. SOF ¶ 68 (Dkt. 35-2); Goldsmith Depo 101:1-15; 120:3-121:6 (Dkt. 34-7).  There is no evidence that Cunningham and Goldsmith discussed Section 30 or that Cunningham evinced a desire to waive its requirements.  To the contrary, Cunningham emailed Goldsmith immediately after the phone call and emphasized that certain terms needed to be reflected in the written amendment.  Goldsmith subsequently emailed Cunningham an unsigned proposed amendment to review.  *See* Stip. SOF ¶¶ 69-70 (Dkt. 35-2).  This evidence shows that the parties expected a written modification to follow the phone call, rebutting Red Butte's claim of implied waiver.

Second, even if the evidence could support a finding of waiver under these facts, reliance remains an element of waiver.  *See Rule Sales & Serv. v. United States Bank Nat'l Ass'n*, 133 Idaho 669, 676 (Idaho App. 1986) ("an implied waiver" of a contractual provision prohibiting oral modifications "occurs where a party's neglect to insist upon enforcing a right results in prejudice to another party").  Red Butte makes no effort to show that it relied on the amendment,

---

[14] The Court finds this choice interesting.  The statue of frauds and Section 30 serve similar purposes.  Red Butte argues that its email correspondence satisfies the former but does not advance the same argument about the latter.  The Court declines to raise this issue on Red Butte's behalf.  *See Jones v. L.A. Cent. Plaza LLC*, 74 F.4th 1053, 1058 (9th Cir. 2023) ("In our adversary system, it is generally up to the parties to decide, within the parameters of the applicable procedural rules, what particular relief they wish to seek, what type of motion they wish to present to obtain that relief, and which arguments they wish to make in support.").  Red Butte is represented by competent counsel and may have considered reasons for interpreting Section 30 more stringently than the statute of frauds.  Even if it does not, the consequences for failing to assert that the parties' emails satisfy Section 30 are low.  Section 30 presents an alternative ground for the Court's ruling, but not a necessary one.

**MEMORANDUM DECISION AND ORDER - 23**

which was rejected by WPG only eight days after the phone call.  For all of these reasons, the alleged amendment to the LOA is unenforceable.

      F.   <u>WPG is entitled to interest as an element of damages.</u>

The LOA provides WPG with two remedies for Red Butte's breach: the return of the option deposit and "any and all additional legal and equitable remedies."  *See* LOA § 9.2 (Dkt. 34-10, pp 3-18).  WPG asks for the return of the option deposit plus interest.  Pl.'s MSJ at 10 (Dkt. 35-1).  Red Butte argued for the first time at the motion hearing that WPG should not recover interest.  Because this argument was not raised in the briefing, it has been waived.  *See Recycle for Change v. City of Oakland*, 856 F.3d 666, 673 (9th Cir. 2017) (arguments raised for the first time during oral argument are waived).

In the alternative, Red Butte's argument fails on the merits.  The plain language of § 9.2 permits the award of "any and all additional legal and equitable remedies."  Red Butte does not identify any legal authority that supports disallowing interest.  In fact, Red Butte's own counterclaim demands "interest at the statutory rate of 12% per annum from and after June 21, 2022."  Ans/Counterclaim ¶ 74 (Dkt. 12).  The Court will award WPG interest at the statutory rate of 12% under I.C. § 28-22-104(1).

## **<u>ORDER</u>**

Based on the foregoing, IT IS HEREBY ORDERED that:

1. Plaintiff/Counter-Defendant Woodbridge Pacific Group, LLC's motion for summary judgment (Dkt. 34) is GRANTED.

2. Defendant/Counter-Claimant Red Butte, LLC'S motion for summary judgment (Dkt. 36) is DENIED.

3. By April 29, 2024, Plaintiff shall confer with Defendant and submit a proposed judgment for the Court's consideration.  The proposed judgment shall "specify the

**MEMORANDUM DECISION AND ORDER - 24**

amounts to be paid and the names of any person or company to whom the funds
are to be paid" as required by Dist. Idaho Loc. Civ. R. 67.2(a).  The proposed
judgment shall also address how to allot the interest, if any, that has accrued on
the deposit after it was deposited with the Clerk of Court on May 1, 2023.  *See*
Dkts. 22-24.

4.  Plaintiff shall note any objections Defendant has to the wording or structure of the
proposed judgment on the proposed judgment.

5.   At the time Plaintiff submits the proposed judgment, Plaintiff shall provide the
Court with a "separate document" containing the information required by Dist.
Idaho Loc. Civ. R. 67.2(b).

DATED: April 15, 2024

Raymond E. Patricco
Chief U.S. Magistrate Judge